[No. B112663. Second Dist., Div. Two. June 18, 1998.]

ALLEN ROBISON et al., Plaintiffs and Appellants, v.
SIX FLAGS THEME PARKS INC., Defendant and Respondent;
STANDARD MOTOR PRODUCTS, INC., Intervener and Appellant.

**COUNSEL**

Law Offices of Young Wooldridge, Michael R. Young and Todd A. Gall for Plaintiffs and Appellants.

Stern, Neubauer, Greenwald & Pauly, Andrew S. Pauly and David C. Smith for Intervener and Appellant.

Byers & Lyden, D. Michael Lyden and Robert D. Anderson for Defendant and Respondent.

## OPINION

**ZEBROWSKI, J.**—This case concerns an accident which occurred when an out-of-control car left the parking area at the Magic Mountain amusement park, entered a picnic area, and struck a picnic bench. One category of appellants is a group of plaintiffs who were picnicking at the picnic bench. In a second category is the employer of a seriously injured plaintiff. The employer intervened to recover the extensive medical costs it paid on behalf of its employee. Respondent (hereafter Magic Mountain) is the owner of the amusement park.

Magic Mountain obtained summary judgment on the theory that Magic Mountain had no duty to protect plaintiffs from such an accident because the accident was unforeseeable, primarily because no similar incident had previously occurred. However, even though no similar incident had previously occurred, the danger was apparent in view of the configuration of the parking lot and picnic area. Magic Mountain thus had a duty to take reasonable measures to protect plaintiffs against such an accident notwithstanding the absence of prior similar incidents. The record could support a finding that Magic Mountain failed to take reasonable protective measures, and the summary judgment will therefore be reversed.

### I. Factual Background.

The record shows the following: Magic Mountain operates a large parking lot outside the entrance to its amusement park. A large rectangular picnic area occupies an "island" within the parking lot. The picnic area is covered with grass, while the parking area is covered with pavement. No curb, change in elevation, tire stop, ditch, foliage, railing, bollard, planter or other barrier separates the pavement from the grass. Instead, level ground simply transitions from pavement to grass as parking area transitions to picnic area.

On the side of the picnic area where the car entered, the parking lot contains four parking lanes aligned perpendicular to the perimeter of the picnic area. The car entered the picnic area from one of these lanes. Any car moving along the lane in question travels directly toward the picnic area. One lane-width before the grass begins, the word "stop" is painted on the pavement. The "stop" is at a "T" intersection where the parking lane joins an exit lane which runs along the perimeter of the picnic area. An exiting car must make a 90-degree left turn at this "T" intersection in order to turn onto the exit lane. Should an exiting car fail to turn left onto the exit lane, and should it instead continue in a straight line, it will cross the exit lane at a perpendicular angle, enter the picnic area, and hit the concrete picnic table maintained in that area by Magic Mountain.

Between the edge of the paved exit lane and the picnic table is about 40 feet of grass. The posted speed limit in the parking lot was 25 miles per hour. A car traveling 25 miles per hour will cover slightly more than 36 feet per second. Thus if a car traveling at the speed limit fails to stop or turn 90 degrees left at the word "stop" and instead continues straight ahead, it will hit the picnic table in approximately 2 seconds. Customers are advised in an informational brochure distributed by Magic Mountain that this picnic area is one of the "guest services" provided, and the customers are hence effectively invited to picnic in this area.

The predictable eventually happened. Plaintiffs were seated at the concrete picnic table when a runaway car traveled down the parking lane, continued without stopping over the word "stop" painted on the pavement, crossed the exit lane and the intervening 40 feet of grass, and hit the picnic table. Several plaintiffs were injured, including one whose leg was crushed between the car and the concrete picnic table, causing extensive blood loss. The runaway car came to rest atop the picnic table.

## II. *Procedural Background.*

Magic Mountain moved for summary judgment on two interrelated grounds. The first concerned the incompetence of the car driver and the unusual circumstances which placed her in the driver's seat of the car. The second was that there had been no similar incidents. Magic Mountain argued that in view of these two factors, the accident was legally unforeseeable, and that according to the cases of *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*) and *Jefferson* v. *Qwik Korner Market, Inc.* (1994) 28 Cal.App.4th 990 [34 Cal.Rptr.2d 171] (*Qwik Korner*), Magic Mountain had no duty to take any precautions. The trial judge agreed, and summary judgment was granted on the ground that "there is no duty on the part of the defendant."

## III. *The Unusual Circumstances Were Not Material to the Duty Analysis.*

A major component of the inquiry into the scope of a negligence duty is the question of foreseeability. A preliminary issue in this case is the proper focus of foreseeability analysis. The proper focus is on the foreseeability of a harmful event of the general type that occurred. The relevant foreseeability is not the foreseeability of the particular and possibly unique details of how and why a particular harmful event came to pass.

Magic Mountain nevertheless emphasizes the rather unique scenario which caused the car to run out of control in this particular case. The

supposedly relevant facts appear to be these: the car was owned by a 21-year-old man. Its starter motor was defective, and the car—which had a standard rather than automatic transmission—had to be push-started. The man drove this car to Magic Mountain and parked about 300 yards from the picnic area. With him was his female friend: a 41-year-old, developmentally disabled woman who received Social Security disability benefits as a "slow learner." The woman had never driven a car, and did not know how to drive a car. Hence when the time came for the couple to push-start the car in order to leave Magic Mountain, the woman pushed the car in the direction of the picnic table while the man tried to start it by operating the clutch and gas pedal. Despite several attempts, the car would not start, apparently because the woman was unable to push the car to a sufficient speed. How close to the picnic area the car had been pushed by the woman is not revealed in the record, although the evidence does suggest that neither the man nor the woman was aware that there was a picnic area at the end of their parking lane. Even though the woman had never before driven a car and did not know how to drive a car, the woman then assumed the driver's position, seated at the steering wheel, while the man pushed. The woman apparently operated the clutch and gas pedals according to instructions, because the motor started on her first attempt. However, not being a driver, she then did not know how to control the car, apparently panicked, and did nothing. The car consequently proceeded down the parking lane while the man ran behind shouting driving instructions without effect. The car continued directly over the "stop" painted on the pavement, traversed the 40 feet of grass, and hit the picnic table at a speed variously estimated at 25 to 40 miles per hour.

■ Magic Mountain contends that it was not foreseeable that a developmentally disabled "slow learner" who had never driven and did not know how to drive would attempt to operate a car with a dysfunctional starter motor as it was being push-started, would succeed in starting the engine, but would then panic and fail to control the car or to turn left, and would instead drive directly into the picnic table. Magic Mountain may have a point that this precise set of facts cannot be considered reasonably foreseeable, but this precise set of facts is not material to the duty analysis. The specific factors which resulted in an out-of-control car—whether due to the incompetence, unconsciousness, distraction, inebriation, paralysis or mistake of the driver; to mechanical malfunction; to a car "running away" without a driver; or to some other cause—are not the material inquiry. This point was explained in *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947]. In *Bigbee*, plaintiff was injured when an out-of-control car struck a telephone booth placed near a driveway in a parking lot adjacent to a major thoroughfare. In evaluating the role of foreseeability in determining duty, the Supreme Court stated that "it is settled that what is required to

be foreseeable is the general character of the event or harm—e.g.. being struck by a car while standing in a phone booth—not its precise nature or manner of occurrence. (*Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044]; *Gibson* v. *Garcia* (1950) 96 Cal.App.2d 681, 684 . . . .)" *Bigbee* hence concluded that the phone company had a duty to place its phone booths in safe locations or otherwise to protect them, and was liable notwithstanding that the booth had been hit by a drunk driver.'

A similar point was made in *Bryant* v. *Glastetter* (1995) 32 Cal.App.4th 770, 780 [38 Cal.Rptr.2d 291], where the court stated. " '[A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct. but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.' " Hence the proper focus of the relevant foreseeability inquiry in the instant case is simply whether it was reasonably foreseeable, in view of the configuration and use of the parking lot and picnic area, that a car might fail to turn left at the word "stop" painted on the pavement. and that picnickers might be injured as a consequence of Magic Mountain's failure to provide an appropriate separation between the parking lot and the picnic area. Even though the precise scenario of a "slow learner" nondriver involved in an effort to push-start a car, etc., may not have been foreseeable, this latter type of unforeseeability does not exonerate Magic Mountain from the consequences of placing an unprotected picnic table directly in the line of traffic.

The trial court correctly did not rely on the unique circumstances of the accident, stating instead that "[t]he question. I guess, is whether you have a duty to foresee the generic runaway car as opposed to the specific reason the car became a runaway . . . ." The foreseeability analysis must properly focus on the general nature of the danger presented—an errant car hitting an unprotected picnic table.

## IV.   *The Ann M. Case.*

*Ann M.*, *supra*, 6 Cal.4th 666, which is heavily relied upon by Magic Mountain and which apparently formed the basis for the trial court's ruling,

---

'*Bigbee* has been widely derided because of its alternative theory that the door to the telephone booth "jammed and stuck." trapping the victim inside and preventing his quick escape. a theory which seemed to imply that it is negligent not to equip a telephone booth with a quick-release door. That aspect of *Bigbee* is not implicated in the instant case, however. The issue in the instant case arises because of Magic Mountain's placement of the picnic table in a direct line with traffic flow without any protective measures. Insofar as the placement issue is concerned. *Bigbee* is similar to the instant case.

concerned the duty of a landowner to take precautions against deliberate criminal acts by third parties. The scene of the crime in *Ann M.* was an outbuilding used to sell photo supplies in the parking lot of a shopping center. When the victim opened the shop one morning, she was raped by an unknown assailant. The issue in *Ann M.* was "whether [defendant landowner] had reasonable cause to anticipate that criminal conduct such as rape would occur in the shopping center premises unless it provided security patrols in the common areas," (*id.* p. 676) and whether the landowner's failure to provide security patrols was negligence. (*Id.* at p. 673.)

The court noted that "[t]he existence of a duty is a question of law for the court. [Citations]. Accordingly, we determine de novo the existence and scope of the duty owed by [the defendant landowner] to Ann M." (*Ann M.*, *supra*, 6 Cal.4th 666, 674.) Preliminarily, the court stated that "[i]t is now well established that California law requires landowners to maintain land in their possession and control in a reasonably safe condition." (*Ibid.*) However, "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.] [¶] In this, as in other areas of tort law, foreseeability is a crucial factor in determining the existence of duty." (*Id.* at p. 676.) The court then made the observation that "random, violent crime is endemic in today's society. It is difficult, if not impossible, to envision any locale open to the public where the occurrence of violent crime seems improbable," (*id.* at p. 678) and stated that "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." (*Ibid.*) Regarding the duty of a landlord to provide protection from foreseeable crime, the court noted that "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed," and that " ' "in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. . . . On the other hand, in cases where . . . the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' . . . Or, as one appellate court has accurately explained, duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Id.* at pp. 678-679.)

The court noted that a requirement of security guards will rarely, if ever, be found to be only a "minimal burden," and that consequently "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." (*Ann M.*, *supra*, 6 Cal.4th 666, 679.) The court ruled that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar

incidents of violent crime on the landowner's premises." (*Ibid.*) Finding no evidence of prior similar incidents, the *Ann M.* court ruled that the defendant landowner's duty of care did not extend to providing security guards.

*Ann M.* provides no support for Magic Mountain in the instant case. As the Supreme Court noted in *Ann M.*, a criminal can commit a crime anywhere. The burden of requiring a landlord to protect against crime everywhere has been considered too great in comparison with the foreseeability of crime occurring at a particular location to justify imposing an omnibus duty on landowners to control crime. Hence, the common law has imposed limitations on the duty of a landowner to protect against crime, specifically because crime can occur anywhere. Rather than imposing a duty to take precautions (such a security guards) generally in all instances, the common law instead looks for a higher level of foreseeability of crime in a particular location, such as might be provided by prior similar incidents at that location.

The instant case is fundamentally different. Crime can happen anywhere, but cars cannot crash into picnic tables just anywhere. In order for a car to crash into a picnic table, the picnic table must first be placed in harm's way. If traffic and picnic tables are placed into a configuration in which the cars can hit the tables, the resulting danger can be identified by simple observation. Here, for example, it was open to simple observation that Magic Mountain had aimed a heavily traveled parking lane (with a speed limit of 25 miles per hour) directly at the picnic table with no separation other than 40 feet of flat grass, and that a car traveling at a speed no higher than Magic Mountain's own speed limit would cover this distance in less than 2 seconds, too short a time to allow for reliable evasive action by an unsuspecting person seated at a picnic table, possibly with his or her back to the oncoming car. When such an observable danger ripens into an accident, the accident is foreseeable for purposes of duty analysis. There is no legal requirement in such circumstances for the type of heightened notice which might be provided by a prior similar incident, as *Ann M.* found may be necessary in instances of third party crime. Instead, the debatable issue usually posed by such circumstances is whether the landowner took reasonable precautions in light of the observable danger presented.

## V. *The Qwik Korner Case.*

Magic Mountain also relies on *Qwik Korner, supra*, 28 Cal.App.4th 990. In *Qwik Korner*, the issue and answer was: "May a convenience store, with a parking lot design typical of the vast majority of such businesses, be held liable when a third party negligently drives his car over a concrete wheelstop

and curb, onto the storefront sidewalk injuring a pedestrian? When there is nothing requiring customers to stand in a fixed location adjacent to the parking area, and when there have been no prior such accidents, the answer is, 'No.'" (*Id.* at p. 991.) The accident in *Qwik Korner* occurred when a young man, after making a purchase in a convenience store, loitered on the sidewalk immediately between the perpendicular parking spaces and the storefront. An elderly man, attempting to park his car, mistakenly stepped on his accelerator rather than on his brake, rode over a concrete wheelstop and the curb, and struck the young man. *Qwik Korner* does not support the summary judgment in favor of Magic Mountain for at least these reasons:

1) In *Qwik Korner*, the landowner did provide "a concrete wheelstop and curb" as safety features, while in the instant case Magic Mountain arguably provided no such safety features.[2]

2) In *Qwik Korner*. there was "nothing requiring customers to stand in a fixed location adjacent to the parking area," while in the instant case the customer was directed to a fixed position at the picnic table in a direct line with the traffic lane.

3) *Qwik Korner* involved a parking space perpendicular to a sidewalk. A driver pulling into such a parking space will expectably be traveling at low speed, will expectably be decelerating in the face of an obvious barrier, and will expectably have his or her foot on the brake pedal. All these factors are relevant to the degree of foreseeability of an accident. The instant case is somewhat different. It involves not a parking space but rather a lane of traffic with a 25-mile-per-hour speed limit aimed directly at the picnic table where plaintiffs were seated, necessitating a ninety degree left turn to avoid an accident, and with no barriers or obstructions of any kind separating the picnic table from the traffic lanes. The one point of similarity is that in both cases it is expectable that most drivers will stop, but it is also foreseeable that some might not. The *Qwik Korner* store thus provided at least a wheel stop and a curb; Magic Mountain arguably provided no protective measures at all.

4) The *Qwik Korner* convenience store also had outside "benches and tables," but these were "[t]o *the side of the storefront.*" (28 Cal.App.4th 990,

---

[2]The record reflects the painted "stop" on the pavement and the 40-foot setback as the only arguable safety measures employed by Magic Mountain. Magic Mountain argues that given the speed of the runaway car in this case, any further precautionary measure it might have reasonably been required to take would have been ineffectual. For example, the car might have jumped a curb, broken through a barrier, etc. This argument, however, is an argument of lack of causal connection between breach of duty and the plaintiffs' injuries, not an argument for lack of duty. Causation is generally a factual issue for trial after the scope of duty (what precautionary measures were reasonably required) is determined.

992, italics added.) Magic Mountain, by contrast, placed its tables in direct line with the traffic lanes without any barriers or other safety features separating the two.

*Qwik Korner* reviews "curb-jumping" cases from around the country and notes that the majority of such cases have concluded that the landowner has no liability. In three categories of cases, however, landowners have been found liable: 1) "cases where the business provided no protection *whatever* from encroaching vehicles," 2) cases in which "the defendants had knowledge of prior similar incidents" and were found liable "even when there was some type of barrier," and 3) "cases where the building design required customers to await service by standing adjacent to a parking lot or driveway" because "if a car jumped the curb, there was a high likelihood that a pedestrian would be at the location." (28 Cal.App.4th 990, 994-995.) The instant case arguably falls into the both first and third of these categories of liability. As to the first, Magic Mountain arguably provided "no protection *whatever*" from an oncoming car which fails to turn left at the appropriate point. As to the third, the design of the parking lot and picnic area required customers to assume a fixed position at the picnic table in the direct line of traffic.

The instant case is more like *Barker* v. *Wah Low* (1971) 19 Cal.App.3d 710 [97 Cal.Rptr. 85], than *Qwik Korner*. In *Barker*, the victim was standing at a drive-in restaurant's walk-up window when a car jumped a wooden bumper stop, pinned him against the wall, and caused injuries from which he died. His widow and five minor children sued the landowner, but the trial court found no breach of duty by the landowner and granted summary judgment. The appellate court reversed, noting that "[t]he record in this case indicates . . . a facility which invites the . . . customers to position themselves in front of parking spaces which were separated from the place for serving the customers only by a wooden barrier. Reasonable [persons] could believe it was necessary to have a barrier separating the waiting customers from those approaching, parking and leaving in vehicles. Reasonable [persons] could believe that the barrier provided was inadequate. Reasonable [persons] could believe that the possibility of a car jumping, lurching, or bolting forward because of mechanical failure, or negligence of the driver, although remote, was foreseeable, and that in balancing this possibility against the risk of harm to patrons assembled at the serving window, it would have been no inordinate burden on the owners or operators, or to the patrons, to have installed a more substantial barrier protecting that particular area of the premises." (*Id.* at p. 721) The court thus concluded that "[t]he chance that a vehicle would strike a patron at the service counter, unless precautions were taken, was foreseeable. Whether the precautions taken

were adequate, and the extent of the hazards from which it was reasonable to require the possessors of the land to furnish protection, are questions of fact." (*Id.* at p. 723)

## VI. *Alcaraz* v. *Vece.*

The recent case of *Alcaraz* v. *Vece* (1997) 14 Cal.4th 1149 [60 Cal.Rptr.2d 448, 929 P.2d 1239] involved a utility meter box embedded in a narrow strip of city-owned land adjacent to the defendant landowner's property. The meter box had a missing or broken lid, and the plaintiff was injured when he stepped into the box. The Supreme Court held that the landowner could be liable for this injury, notwithstanding the lack of any evidence of prior incidents, and even though the landowner did not own the land where the accident occurred. The court stated, " 'The proper test to be applied to the liability of the possessor of land . . . is whether in the management of his property he has acted as a reasonable [person] in view of the probability of injury to others . . . .' (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) This requires persons 'to maintain land in their possession and control in a reasonably safe condition. [Citations.]' (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)" (*Alcaraz* v. *Vece, supra,* 14 Cal.4th 1149, 1156.) The court stated that if the defective meter box created a "dangerous condition" on land in defendant's possession or control, then the defendant had a duty to take reasonable measures "to protect persons on the land from that danger." (*Ibid.*) Although *Alcaraz* cites *Ann M.*, it makes no mention of prior similar incidents in this noncrime premises liability case.[3] Instead, the issue in *Alcaraz* was simply whether there was a triable issue regarding whether the landowner had exercised control over the area in question. *Alcaraz* refutes Magic Mountain's argument that it had no duty to take precautions of any kind to guard against the danger posed by the configuration of its parking lot and picnic area. As Witkin states, "Liability is particularly appropriate where the landowner has actual knowledge of the danger, e.g., where he has created the condition." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 925, p. 296.)

## VII. *Conclusion.*

"Conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person." (6 Witkin, Summary of

---

[3]*Alcaraz* does note that a neighbor had notified the defendant landowner that the lid of the meter box was broken or missing. (*Alcaraz* v. *Vecer, supra,* 14 Cal.4th at p. 1154.) Thus there was evidence that although the landowner had not created the dangerous condition, the landowner had notice of it. In the instant case, by contrast, Magic Mountain created the dangerous condition.

Cal. Law, *supra*, Torts, § 751, p. 89.) The general danger of a car hitting unsuspecting picnickers in the picnic area Magic Mountain placed in its parking lot was foreseeable, and Magic Mountain's focus on the specific circumstances under which the developmentally disabled woman lost control of this car in this particular instance is misplaced. When an unreasonable risk of danger exists, the landowner bears a duty to protect against the first occurrence, and cannot withhold precautionary measures until after the danger has come to fruition in an injury-causing accident. (Cf., e.g., *Alcaraz v. Vece*, *supra*, 14 Cal.4th 1149.) Thus the lack of prior similar incidents was not a proper basis for summary judgment. Determination of the extent of Magic Mountain's duty (i.e. what reasonable protective measures Magic Mountain should have employed) will require a balancing of the probability of an accident, the severity of the expectable harm, the burden of providing specific protective measures, etc. (see, e.g., *Ann. M.*, *supra*, 6 Cal.4th 666), an exercise shortstopped here by the erroneous summary judgment. We will therefore remand for that factual development and analysis to be performed in the trial court.

## VIII. *Disposition.*

The summary judgment is reversed. The case is remanded for further proceedings not inconsistent with this opinion. Appellants (both plaintiffs and intervener) to recover costs on appeal.

Fukuto, Acting P. J., and Nott, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 23, 1998. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.